IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | * CRIMINAL NO. 2:23-CR-00185-01 |
| | * |
| VERSUS | * |
| | * DISTRICT JUDGE CAIN |
| BRENDAN DELAFOSE | * MAGISTRATE JUDGE KAY |

---

## UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS INDICTMENT

---

### I.   INTRODUCTION

NOW COMES the United States of America, through undersigned counsel, who respectfully opposes the motion to dismiss the indictment filed by the defendant, Brendan Delafose, which challenges the constitutionality of the federal felon-in-possession and possession of a machinegun statutes: Title 18, United States Code, Section 922(g)(1) and 922(o). ECF No. 19. The defendant's memorandum of law patterns its analysis, at least in part, from *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023)[1], a decision which is neither binding on this Court nor was correctly decided in light of the Supreme Court's holding in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF No. 48-1.

---

[1]  The Solicitor General of the United States has authorized an appeal in *Bullock*, and that appeal is currently pending in the U.S. Fifth Circuit (docket number 23-60408).

In *Bruen*, the Supreme Court held that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. However, *Bruen* did not call into question felon dispossession statutes like Section 922(g)(1) or machinegun statutes like Section 922(o) and is therefore inapplicable in this case. Even if *Bruen* did apply, Sections 922(g)(1) and (o) would satisfy its historical analogy test. Accordingly, and for the reasons set forth below, the defendant's motion to dismiss the indictment should be denied.

## II.     BACKGROUND

On August 16, 2023, a federal grand jury returned a two-count indictment charging the defendant with violating Section 922(g)(1) for being a felon in possession of a firearm and 922(o) for being in possession of a machinegun, specifically a Glock with an automatic conversion device attached. ECF No. 1. The defendant became a felon in 2018 when he was found in Lake Charles, Louisiana in possession of Alprazolam, Hydrocodone, Promethazine and Codeine; and possessing under his immediate control two (2) firearms during the sale or distribution of a controlled dangerous substance. The defendant plead guilty to amended charges of Possessing a Controlled Dangerous Substance, a felony, and Illegal Carrying of a Weapon, a misdemeanor. The defendant signed a form entitled "Felony Plea of Guilty and Waiver of Constitutional Rights," and received a deferred imposition of sentence in

accordance with Louisiana Criminal Procedure Article 893 (recognized as a felony conviction under Louisiana law), a sentence of two (2) years of supervised probation, a fine of $150, and forfeiture of the firearms. The defendant's probation was terminated early despite probation's noted noncompliance.

The Glock and automatic conversion device, a machinegun under federal law, were located by Calcasieu Parish Sheriff's Office Deputies subsequent to a traffic stop on July 17, 2021, after the defendant was observed driving carelessly on the roadway in Lake Charles, Louisiana. Deputies pulled the defendant, sole occupant and driver of the vehicle, over and instructed the defendant not to reach for anything. The defendant continued to reach for his pockets after being warned and was detained. The defendant then told deputies that he had marijuana in his pocket which is why he was reaching for his pockets but denied having a firearm. After obtaining the marijuana from the defendant, deputies searched the vehicle finding the Glock, Glock switch, a magazine and extended magazine under the driver seat. Both were loaded with live rounds. Later investigation revealed that the defendant's cousin left the firearm in the vehicle without an automatic conversion device or extended magazine. The defendant was notified of this by his cousin. The defendant held onto the firearm, and instead of returning the Glock, the defendant added a switch to convert it to a machinegun.

## III. LAW AND ARGUMENTS

This Court should deny the defendant's motion to dismiss the indictment for three reasons. First, the defendant argues that Sections 922(g)(1) and (o) violate the

Second Amendment of the United States Constitution based on principles articulated in *Bruen*. This Court should reject that argument because *Bruen* did not call into question felon-dispossession statutes or possession of machineguns and is therefore inapplicable in this case. *Bruen* concerned firearm (not machinegun) regulations aimed at "law abiding citizens" and not a statute—Section 922(g)(1)—whose own elements limit itself to regulating non-law-abiding citizens.

Second, even if *Bruen* applied, Section 922(g)(1) would satisfy its historical analogy test as the Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed, and this Nation's historical tradition also confirms that felons can be dispossessed of firearms. Section 922(o) would satisfy its historical analogy test because the Second Amendment's right to bear arms did not include military grade firearms such as machineguns.

Lastly, the defendant argues application of 922(g)(1) to the facts of his case would violate his constitutional rights because the defendant's felony conviction was for a non-violent offense. However, federal jurisprudence does not distinguish violent from non-violent offenses as it relates to felon in possession statutes for which there is an underlying felony punishable by imprisonment of greater than one year. Even so, controlled substances and firearms have long been linked to violent criminal behavior. The defendant's argument as applied to him should be denied.

A.   <u>***Bruen* did not call into question felon-dispossession statutes or machineguns and, therefore, does not apply to this case**</u>.

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the

people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Section 922(g)(1) criminalizes the possession of firearms by convicted felons. The United States Court of Appeals for the Fifth Circuit has routinely upheld Section 922(g)(1) and (o) and found it "does not violate the Second Amendment." *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003); *see also United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009) (reaffirming *Darrington* post-*Heller*); and *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (concluding that machineguns are dangerous weapons).

In *Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. 554 U.S. at 635. *Heller* also clarified that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626-27 & n.26.

Similarly, in *Bruen*, the Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. *Bruen* struck down a New York law that required residents to demonstrate a "proper cause" to obtain a license to carry a handgun outside of their homes because the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2122, 2156.

Importantly, *Bruen* does not question *Heller*'s statements about longstanding prohibitions, such as the dispossession of firearms by felons. For example, Justice Alito explained in concurrence that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns." 142 S. Ct. at 2157 (Alito, J., concurring) (cleaned up). And Justice Kavanaugh (joined by the Chief Justice) emphasized that "the Second Amendment allows a 'variety' of gun regulations" and reiterated *Heller*'s statement about not "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J., concurring) (quotations omitted).

Because *Bruen* did not overturn "longstanding prohibitions" like "possession of firearms by felons," this Court should not reconsider the constitutionality of Section 922(g)(1) in this case. *See, e.g.*, *United States v. Roy*, No. 22-10677, 2023 WL 3073266, at *1 (5th Cir. Apr. 25, 2023) (rejecting post-*Bruen* challenge to the constitutionality of Section 922(g)(1) on plain error review); *United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. Apr. 25, 2023) (same). Likewise, this Court should not reconsider the constitutionality of Section 922(o). Machineguns remain unprotected by the Second Amendment because "machineguns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes,' " *Henry* employed the same standard established by *Heller* and confirmed in *Bruen*. See *Henry*, 688 F.3d at 640 (citing *Heller*, 554 U.S. at 625).

Accordingly, the defendant's motion to dismiss should be denied.

**Page 6 of 26**

**B.** **Even if *Bruen* applied in this case, Section 922(g)(1) and (o) would survive its two-pronged test.**

Even if *Bruen* required this Court to consider Section 922(g)(1) and (o)'s constitutionality afresh, the defendant's arguments would still not prevail. *Bruen* "reiterate[d]" the "standard for applying the Second Amendment." 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when a regulation burdens such presumptively protected conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Here, the Second Amendment's plain text and historical context do not prevent Congress from banning firearm possession by felons or possession of machineguns. Moreover, even if the Second Amendment's plain text applied to the charged conduct in this case, Sections 922(g)(1) and (o) are consistent with the Nation's historical tradition of firearm regulation.

**i.** ***The Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed.***

Under *Bruen*, when considering the constitutionality of a firearms regulation, courts look to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Two independent aspects of the Amendment's text demonstrate that it does not prevent legislatures from disarming felons. And *Heller* and *Bruen*'s authoritative interpretation of the text confirm that view.

First, felons do not fall within "the people" protected by the Second Amendment, a term *Heller* said refers to "members of the political community." *Heller*, 554 U.S. at 580. Legislatures have historically had wide latitude to exclude felons from the political community. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitation," *id.* at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868). Felons could therefore be historically excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998). Indeed, today it remains the case that "[t]he commission of a felony often results in the lifelong forfeiture of a number of rights" tied to membership within the political community, including "the right serve on a jury and the fundamental right to vote." *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

Second, regardless of whether felons fall within "the people," the "right . . . to keep and bear arms" has never been understood to prevent the disarming of felons. *Heller* explained that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The 1689

English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, provided that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law," *id.* (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). The wording of that provision indicates that "the legislature—Parliament—had the power and discretion to determine who was sufficiently loyal and law abiding to exercise the right to bear arms." *Range v. Attorney General*, 53 F.4th 262, 275 (3d Cir. 2022). Thus, when the "Second Amendment . . . codified [the] *pre-existing* right" to bear arms, *Heller*, 554 U.S. at 592, it codified a right that was "not unlimited," *id.* at 626, and was not understood to extend to lawbreakers.

The Constitution's ratification debates support this understanding of the Second Amendment's text. In what *Heller* called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir 2010) (en banc) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). This "Second Amendment precursor[ ]," *Heller*, 554 U.S. at 604, indicates that the Second Amendment allowed the legislature to disarm those who had committed serious "crimes" such as felonies. Thus, the Second Amendment's plain text, understood in its historical context, does not prevent Congress from disarming felons.

The Supreme Court's authoritative interpretation of the Second Amendment's plain text further confirms this view. *Heller* explained that, "[l]ike most rights, the

right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. *Heller* indicated that "prohibitions on carrying concealed weapons" were lawful. *Id.* It said that the Second Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotations omitted). And the Court said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Thus, in conducting its "textual analysis" of the Second Amendment, *id.* at 578, *Heller* saw no inconsistency between its plain text and laws prohibiting "possession of firearms by felons," *id.* at 626.

Moreover, *Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635, a category which clearly excludes felons. *See United States v. Hernandez*, No. 3:23-CR-0056-B, 2023 WL 4161203, at *6 (N.D. Tex. June 23, 2023) (citing *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)), and noting that "[f]elonies remain the most serious category of crime and reflect a 'grave misjudgment and maladjustment'"). *Bruen* echoed that definition, stating no fewer than fourteen (14) times that the Second Amendment protects the rights of "law-abiding" citizens." 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. And six justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain

firearms regulations, such as prohibitions on the possession of firearms by felons, are constitutional. *See id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . , about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "'longstanding prohibitions on the possession of firearms by felons'" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626, 636)); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).

Additionally, when "reiterat[ing]" the standard applicable to Second Amendment claims, *id.* at 2129, *Bruen* endorsed the constitutionality of "shall-issue" firearm-carry licensing regimes, many of which deny licenses to felons either directly or through incorporating federal law. *See, e.g.*, La. Stat. Ann. § 40:1379.3(C)(6). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." 142 S. Ct. at 2138 n.9. The Court said that those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would

make little sense if the Second Amendment in fact prevented legislatures from disarming felons. Thus, the Amendment's plain text—and the Supreme Court's decisions interpreting that text—demonstrate that the Amendment does not prohibit the disarming of felons.

ii.     ***The Nation's historical tradition also confirms that felons can be dispossessed of firearms.***

Section 922(g)(1)'s constitutionality is further confirmed by a review of "this Nation's historical tradition of firearm regulation." *Id.* at 2126.  Specifically, two types of historical laws support Section 922(g)(1)'s constitutionality: (1) laws authorizing capital punishment and estate forfeiture for felons, and (2) laws disarming those deemed untrustworthy based on lack of adherence to the rule of law.

For centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence for which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008)

**Page 12 of 26**

(Thomas, J., concurring) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery, arson, malicious maiming and wounding, and counterfeiting.  2 Laws of the State of New York Passed at the Session of the Legislature (1785-1788) at 664-65 (1886). The act established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offense committed, or at any time after." *Id.* at 666. For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death." *Id.* at 665.

Two years earlier, New York passed a law severely punishing counterfeiting of bills of credit. 2 Laws of the State of New York Passed at the Session of the Legislature (1785–1788) at 260-61 (1886). The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261.  In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron." *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously "ha[d] not a punishment sufficiently exemplary annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821). The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of the commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both.  For example, a 1700 Pennsylvania law provided that any person convicted of "willfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be

imprisoned all their lives in the House of Correction at hard labor." 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896). A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor." *Id.* at 178. A 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall forfeit all his goods and chattels, lands and tenements." 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811). A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767).  And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattels [sic]," in addition to receiving 39 lashes and one year's imprisonment. 3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.  Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Id.* at 158, 160.

A second category of historical laws also provides an analogy to felon disarmament—laws that "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Range*, 53 F.4th at 274. In 1689, the same Parliament that "wr[ote] the 'predecessor to our Second Amendment' into the 1689 English Bill of Rights," *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593), also passed an "Act for the better secureing the Government by disarming Papists and reputed Papists." 1 W. & M., Sess. 1, ch. 15, 6 Statutes of the Realm 71.[2]  That Act provided that any Catholic who refused to make a declaration renouncing his faith could not possess any "Arms Weapons Gunpowder or Ammunition (other th[a]n such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.* at 72. The required oath "was a gesture of allegiance to the English government and an assurance of conformity to its laws." *Range*, 53 F.4th at 275.

---

[2]    Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 Journal of the House of Lords (1685-1691) 208-09 (reflecting enactment on May 11, 1689).

**Page 16 of 26**

American colonies enacted similar laws. For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). And during the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the king. 7 Statutes at Large; Being a Collection of All the Laws of Virginia 35-36 (1820) (1756 law). These laws discriminating based on race or religion are repugnant and would be unconstitutional today for reasons having nothing to do with the Second Amendment, but they nevertheless demonstrate that colonial legislatures "had the power and discretion to use status as a basis for disarmament" even of non-violent groups. *Range*, 53 F.4th at 276 n.18.

During the Revolutionary War, Connecticut passed a law providing that any person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states, *see, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General

Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). Again, these laws demonstrate that, at the time of the founding, legislatures had the authority to disarm even non-violent people whom they deemed not to be law-abiding and trustworthy.

The right to bear arms is analogous to historical laws that made certain civic rights subject to forfeiture by individuals convicted of crimes. Felons were generally excluded from service on juries in eighteenth-century America. *See* Brian C. Kalt, *The Exclusion of Felons From Jury Service*, 53 Am. Univ. L. Rev. 65, 179 (2003). They were also generally excluded from voting. "[E]leven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons." *Green v. Bd. Of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967). Just as historical laws required persons convicted of felonies to forfeit civic rights, Section 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale County Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment).

Both types of historical statutes discussed above demonstrate Section 922(g)(1)'s constitutionality. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in

1791." 142 S. Ct. at 2132. *Bruen* identified two relevant metrics for this analogical inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. (emphasis and quotations omitted).

Under the first metric, Section 922(g)(1) imposes *no* "burden [on] a law-abiding citizen's right to armed self-defense." *Id*. at 2133. "[C]onviction of a felony necessarily removes one from the class of "law-abiding, responsible citizens' for the purpose of the Second Amendment." *Hamilton*, 848 F.3d at 626. Moreover, the burden imposed on the felon's rights is comparable to historical laws disarming the untrustworthy and *less* severe than many historical felony-punishment laws, which often included the death penalty and forfeiture of one's entire estate.

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. The historical laws sought to adequately punish felons and deter re-offending, as well as to protect society from the untrustworthy. Section 922(g)(1) serves a more limited but equally justified purpose. It seeks to protect society from gun violence committed by felons, who have previously shown disregard for society's laws and are more likely to reoffend, potentially in dangerous ways. Thus, Section 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation that felons can be dispossessed of firearms.

>   ### iii.   *The Second Amendment's plain text and historical context indicate that possession of machineguns can be prohibited.*

Much of the same case law above relating to possession of firearms by felons governs the regulation of machineguns in the general population. The Supreme Court in *Heller* concluded the right to possess firearms as a common law right that preceded the Constitution, which the Framers understood to exclude certain groups at the same conclusion. 554 U.S. at 626–27, 128 S.Ct. 2783. Courts and commentators "[f]rom Blackstone through the 19th-century," according to *Heller*, agree "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626, 128 S.Ct. 2783. In a footnote, the *Heller* Court says these "presumptively lawful" measures are an illustrative, not exhaustive list. *Id.* at 627 n. 26, 128 S.Ct. 2783. The *Heller* Court further identifies "another important limitation on the right to keep and bear arms" as the type of firearm protected. *Id.* at 627, 128 S.Ct. 2783. Only those firearms "in common use" at the time of ratification are protected, and "dangerous and unusual weapons" are prohibited. *Id.*

Subsequent Supreme Court opinions do not disturb *Heller's* pronouncement about these presumptively lawful restrictions. Two years after *Heller*, in *McDonald*, the Supreme Court repeated its assurances that, despite the respondents' "doomsday proclamations," the Court had no intention of casting doubt on "longstanding" regulatory measures. *McDonald*, 561 U.S. at 786, 130 S.Ct. 3020 (citing *Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783.). In *Bruen*, the Supreme Court characterizes its

holding as "in keeping with *Heller*" and repeatedly refers to the Second Amendment right afforded "law-abiding citizens." 142 S. Ct. at 2126. Furthermore, in their concurring opinions to the *Bruen* decision, Justices Alito and Kavanaugh affirm the *Heller* Court's embrace of presumptively lawful restrictions. *Id.* at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring).

### iv.   The Nation's historical tradition also confirms that machineguns can regulated.

"When it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2136, 213 L. Ed. 2d 387 (2022). Therefore, to carry its burden, the Government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Id.* at 2131–32 (internal quotation marks omitted). However, the Government need not identify a "historical twin"—a historical analogue is sufficient, and "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. "[T]he Constitution can, and must apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. The core question is whether the challenged law and the proffered analogue are "relevantly similar." *Id.* Two metrics for this analysis are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

In the wake of the *Bruen* decision, criminal defendants across the country are challenging the constitutionality of federal firearms offenses codified in 18 U.S.C. §

922. Challengers argue the law's recent vintage makes it suspect under *Bruen's* text-and-history analysis. Indeed, the Federal Firearms Act was first enacted in 1938, making it relatively modern in comparison to the founding-era historical analysis required by *Bruen*, 142 S. Ct. at 2131–32.

"[S]ince *Heller* was decided, every circuit court to address the issue has held that there is no Second Amendment right to possess a machinegun." *United States v. Hoover,* 635 F. Supp. 3d 1305, 1325 (M.D. Fla. 2022) (quoting *United States v. Henry*, 688 F. 3d 637, 639–40 (9th Cir. 2012)); see, e.g., *United States v. One (1) Palmetto State Armory PA15 Machinegun Receiver/Frame*, 822 F.3d 136, 143 (3d Cir. 2016) ("[T]he Second Amendment does not protect the possession of machineguns. They are not in common use for lawful purposes."); *United States v. Allen*, 630 F.3d 762, 766 (8th Cir. 2011); *Hamblen v. United States*, 591 F.3d 471, 472, 474 (6th Cir. 2009); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machineguns are not in common use by law-abiding citizens for lawful purposes."), cert. denied, 555 U.S. 1174 (2009); see also *Hollis v. Lynch*, 827 F.3d 436, 448–41 (5th Cir. 2016) ("Machineguns are dangerous and unusual and therefore not in common use. They do not receive Second Amendment protection ....").

And since *Bruen* was decided, district courts have continued to reach the same result. See, *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487, at 9 (W.D. Tex. Feb. 10, 2023), reconsideration denied, No. SA-22-CR-00379-JKP, 2023 WL 3082358 (W.D. Tex. Apr. 25, 2023). ("[M]achineguns are within the category of 'dangerous and unusual' weapons that do not receive Second Amendment

protection."); United States v. Kittson, 2023 WL 5015812, at 3 (D. Or. Aug. 7, 2023) ("[M]achineguns are dangerous and unusual weapons not protected by the plain text of the Second Amendment."); *Cox v. United States*, 2023 WL 4203261, at 7 (D. Alaska June 27, 2023) ("Machineguns are not protected 'arms' under the Second Amendment because they are both 'dangerous and unusual' ...."); *United States v. Dixon*, 2023 WL 2664076, at 3 (N.D. Ill. Mar. 28, 2023); *United States v. Kazmende*, 2023 WL 3872209, at 2 (N.D. Ga. May 17, 2023) ("[M]achineguns are dangerous and unusual weapons that are outside the protection of the Second Amendment ...."), report and recommendation adopted, 2023 WL 3867792 (N.D. Ga. June 7, 2023).

### C. **922g(1) is constitutional as applied to the defendant**.

Courts that have considered as applied challenges to felon in possession laws generally start with a strong presumption that Congress was correct in deeming felons to have a proclivity for violence or a tendency to disturb the peace. See *Binderup*, 836 F.3d at 351 ("[W]e will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise."). However, legal scholarship posits that modern criminal codes punish some individuals with felony length sentences who provide no cause for concern that they pose a danger to public safety. See *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (arguing that a conviction of "mail fraud for falsely representing that [Mr. Kanter's] company's therapeutic shoe inserts were Medicare-approved" lacked "individual markers for risk...."); See also *Marshall*, supra, at 695–96 (wondering why disarming Martha Stewart, who was convicted of obstruction of

justice, making false statements, and two counts of conspiracy in connection with insider trading, makes the public safer).

The defendant in this case is not in a position as the above two defendants. His criminal record shows several reasons to suspect that the defendant being armed could make the public less safe. First, the defendant's previous felony conviction shows a willingness to disregard the harm that his actions could inflict upon the public. He previously possessed two firearms alongside dangerous controlled substances that were not prescribed to him. He admitted to this and signed a form waiving his rights and ability to possess a firearm. Yet after that, he is found again with not just a firearm but a machinegun while possessing marijuana on his person. The defendant's drug crimes justify stripping him of his Second Amendment rights. Congress is aware "that drugs and guns are a dangerous combination." *Smith v. United States,* 508 U.S. 223, 240, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (citing statistics on the percentage of murders relating to the drug trade).

The defendant plead guilty to a felony possession of a controlled dangerous substance and a misdemeanor illegal possession of a weapon. Similar to the defendant in *Goins*, the court opined, "while Mr. Goins's convictions are only for possession, they flag him as having an above average chance of committing further crimes. Surveys indicate that as many as 17% of state prisoners and 18% of federal inmates claim to have committed their offenses to obtain money for drugs. *Drug Use and Crime, Bureau of Justice Statistics* (June 1, 2021), https://bjs.ojp.gov/drugs-and-crime-facts/drug-use-and-crime. A study of drug court participants nationwide found

**Page 24 of 26**

that 16.4% of drug court graduates committed a subsequent felony level offense within a year of graduating. *John Roman, Wendy Townsend, & Avinash Singh Bhati, Recidivism Rates for Drug Court Graduates 2* (2003), https://www.ojp.gov/pdffiles1/201229.pdf. That number increases to 27.5% two years from graduation. *Id.* Mr. Goins's drug offenses indicate that he is more likely than the average person to commit a future felony, marking him as the sort of threat to public safety that Congress can permissibly seek to eliminate by stripping him of his Second Amendment rights." *United States v. Goins*, 647 F. Supp. 3d 538, 554–55 (E.D. Ky. 2022).

The Chief Judge of the Western District of Louisiana clearly stated in *Edwards*, "*Heller*, *Bruen*, *Rahimi*, and *Daniels* are saying that convicted felons are not a part of "the people" covered by the Second Amendment. Therefore, Edwards' argument fails, because, as a convicted felon, the Second Amendment's plain text does not cover his conduct. *United States v. Edwards*, No. 3:23-CR-00199-01, 2023 WL 6247298, at *3 (W.D. La. Sept. 25, 2023). Likewise, because the defendant in this case is a convicted felon under Louisiana law, his motion should be denied as applied to him.

### III.   CONCLUSION

Accordingly, and for the reasons set forth above, this Court should deny the defendant's motion to dismiss the indictment. *Bruen* did not call into question felon-dispossession statutes like Section 922(g)(1) or machinegun statutes like Section 922(o). Instead, *Bruen* concerned firearm regulations aimed at "law abiding citizens,"

not a statute whose own elements limit itself to regulating non-law-abiding citizens or firearms that are unusual and extraordinarily dangerous. But even if *Bruen* applied, Sections 922(g)(1) and (o) would still satisfy its historical analogy test because the Second Amendment's plain text and historical context indicate that felons can be constitutionally disarmed, the Nation's historical tradition confirms that felons can be dispossessed of firearms, and the regulation of military like firearms such as machineguns can be regulated.

Respectfully submitted,

BRANDON B. BROWN
United States Attorney

*/s/ Casey Richmond*
CASEY RICHMOND (AR Bar No. 2018038)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Phone: 337-262-6668
Email: casey.richmond@usdoj.gov

**Page 26 of 26**